UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 26 CR 291 |
| v. | |
| | Hon. Keri L. Holleb Hotaling |
| AMIR A. FAGAN, DEMOND EDWARDS, and CHASHONN TONEY | Magistrate Judge |

## GOVERNMENT'S OPENING BRIEF ON SANCTIONS HEARING AND REQUEST FOR CONTINUANCE

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully submits this opening brief concerning the hearing on sanctions ordered by this Court on June 18, 2026, as supplemented by the Court's order of June 26, 2026 (hereinafter "the Court's Orders"). Dkt. Nos. 21, 28.

### I. SUMMARY OF GOVERNMENT'S BRIEF

The government's position is that this Court lacks the authority to conduct the hearing contemplated by the Court's Orders. First, the Court's authority to conduct a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), was mooted by dismissal of the criminal complaint. Second, this Court lacks the authority to hold any persons in contempt under the Federal Magistrates Act; at most, the Court can certify the matter to the district court for further proceedings. Third, this Court lacks authority to make any sanctions finding, as this authority too is exclusively vested in the district court.

Even if this Court had authority to conduct the broad factfinding hearing contemplated by the Court's Orders—which the Court does not—there are several procedural issues that require clarification and resolution in advance of the hearing. First, the inquiry should be limited to the testimony of the complaint affiant, Special Agent Scott Erthal of the Federal Bureau of Investigation ("FBI"). Second, the Court should preclude counsel representing the dismissed defendants from participating in the hearing. Third, the Court should develop procedures to ensure that the identities of the undercover agents and the confidential informant are protected.

In light of the significant legal and procedural issues at issue in this case—not least of which is that the Court lacks authority to conduct the contemplated hearing as a threshold matter—the government respectfully requests that the Court continue the evidentiary hearing date currently set for July 2, 2026. A short continuance will allow the Court to resolve the issues in a deliberative and unhurried manner with input from all parties.[1] In addition, were the Court to disagree with the government's position as stated here, and given the serious constitutional and statutory issues raised by the Court's currently-ordered evidentiary hearing, the government plans appealing to the district court for intervention. Thus, the government asks that the Court stay any order seeking to proceed with a hearing of any kind.

---

[1] Although the government believes that defense counsel should not have any role in the evidentiary hearing contemplated by the Court, the government does not object to the Court's inviting defendants to submit briefs concerning the issues raised in this submission.

2

## II.   PROCEDURAL BACKGROUND

As this Court is aware, the above-captioned matter commenced with the filing of a criminal complaint on June 11, 2026, which was supported by an affidavit submitted by FBI Special Agent Scott Erthal (hereinafter "the Affidavit"). Dkt. No. 1. The complaint charged defendants Amir Fagan and Demond Edwards with attempted robbery, in violation of 18 U.S.C. §§ 2114(a) and 2, and defendant Chashonn Toney with assaulting an officer and employee of the United States, in violation of 18 U.S.C. § 111(a). *Id.*

On June 9, 2026, during a planned controlled firearms purchase, multiple individuals engaged in the attempted robbery of United States currency from undercover agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") and a confidential informant working at ATF's direction. The FBI was not part of the underlying gun trafficking investigation but was tasked with also investigating the alleged attempted robbery and vehicular assault on a federal officer.

Toney had his initial appearance on June 11, 2026, and attorney Joshua Adams was appointed to represent him. Dkt. No. 9. Toney waived his right to a detention hearing but requested a preliminary hearing, which this Court scheduled for June 18, 2026. *Id.*

Fagan sustained gunshot injuries on June 9, 2026, and was thereafter transported to a hospital to receive medical treatment. Fagan was released from the hospital on June 12, 2026, and had his initial appearance the same day. Dkt. No. 8. This Court appointed attorney Lisa Noller to represent Fagan. *Id.* Fagan waived his

right to a preliminary hearing but requested a detention hearing. *Id*. On June 16, 2026, following a hearing, this Court ordered that Fagan be detained. Dkt. No. 12.

Edwards also sustained injuries from a gunshot on June 9, 2026. Although Edwards remained in the hospital due to his injuries, on June 14, 2026, attorney Michael Levinsohn filed an appearance on his behalf. Dkt. No. 10. Edwards did not have an initial appearance.

On June 17, 2026, the government notified this Court by email that Toney's preliminary hearing did not need to go forward because the government planned to move to dismiss the complaint without prejudice. Dkt. No. 13. The Court then scheduled a conference call with all counsel of record. *Id*. Shortly before that conference call, the government filed a written motion to dismiss the criminal complaint without prejudice. Dkt. No. 14. The motion to dismiss stated that, on June 16, 2026, the immediate prosecution team received a video, not previously possessed by the United States Attorney's Office (Exhibit 2 to the motion to dismiss), which depicted the shooting of Edwards during and in relation to his arrest. *Id*. ¶¶ 6–7. In fact, following an inter-agency anti-violence meeting, an ATF official had mentioned the video to members of the U.S. Attorney's Office's Front Office, including First Assistant United States Attorney ("FAUSA") Jason Yonan, on June 12, 2026, but not in connection with the case, but rather regarding an ancillary matter, specifically, in the context of the upcoming release of the video by the Civilian Office of Police Accountability. However, ATF did not provide a copy of the video to FAUSA Yonan—or any other representative of the U.S. Attorney's Office or the FBI—at that

4

time. *Id.* ¶ 6. The Front Office, including FAUSA Yonan, simply assumed that the immediate case team, including the assigned prosecutors and Special Agent Erthal, possessed the video. *Id.*

The motion to dismiss asserted that the contents of that video created a concern that "[a]spects of the [Edwards] shooting, as depicted in [the recently received video] appear inconsistent with the description of the shooting as set forth in the Criminal Complaint." *Id.* at ¶¶ 8-9.[2] With regard to Toney, the motion to dismiss further stated that, based upon an email from an ATF special agent on June 15, 2026 (Exhibit 4 to the motion to dismiss), "[a]spects of the description of [Toney's] flight in [the email] appear to be potentially inconsistent with the description of the flight as set forth in Paragraph 16 of the Complaint." *Id.* at 9-11. The motion to dismiss did not indicate any concerns about the evidence against Fagan as described in the Affidavit. *See* Dkt. No. 14.

On June 17, 2026, this Court held a conference call with counsel for the parties (the defendants' appearance was excused). Dkt. No. 19. Without objection from the government, this Court ordered that Fagan and Toney be released from custody immediately. *Id.* The Court then set an in-person hearing on the matter for June 18, 2026, and ordered a member of the Front Office to be present. *Id.*

On June 18, 2026, the Court held a hearing on the motion to dismiss. Dkt. No. 21. The hearing was attended by counsel for all parties, and FAUSA Jason Yonan

---

[2] Agent Erthal had neither received nor reviewed a copy of the video before it was sent to the prosecutors assigned to the investigation.

appeared on behalf of the Front Office.[3] During the hearing, AUSA Fiedler and FAUSA Yonan explained the circumstances by which the United States Attorney's Office learned of the existence of the video from a discussion of COPA's expected public release of the video, and then the subsequent circumstances by which the United States Attorney's Office came into possession of the subject video after the criminal complaint was sworn out. 6/18/26 Tr. at 9-17, 36-38. Counsel for Fagan and Toney requested that the criminal complaint be dismissed with prejudice. *Id.* at 18-22, 31-33. Throughout the hearing, the government asserted its good faith and asked that the dismissal be without prejudice. *Id.* at 31, 37-38. After summarizing the standard for dismissal under Federal Rule of Criminal Procedure 48(a), this Court dismissed the complaint without prejudice. *Id.* at 38-41; Dkt. No. 21. The Court then scheduled a hearing to address the possible imposition of sanctions, stating as follows:

> The next point is that Ms. Noller separately raised an issue of should there be other some type of a sanction. The Court is still concerned here that I don't have the full picture of everything. As I said, I haven't been able to understand what this agent knew at the time that I put under oath that would form the basis of this complaint in this case. The agent is not present here today.
>
> I do think that it makes sense to hold this case open. You know, the complaint has been dismissed, the criminal complaint is dismissed, but to keep the case open for a separate hearing to address those issues. And I think that that's important.
>
> And I think I want to give the parties time. The Court doesn't want to rush through this, right? These are serious things. I don't want to be saying an FBI agent acted in bad faith or made material

---

[3] In addition to FAUSA Yonan, the government was represented by AUSA Luke Fiedler, AUSA Adam Rosenbloom (AUSA Fiedler's immediate supervisor), and AUSA Cornelius Vandenberg (the Chief of AUSA Fiedler's Section). The case team did not invite Agent Erthal to attend the hearing because they did not believe his appearance was required or necessary.

misrepresentations. I want to understand all of that before I would make any type of finding such as that.

6/18/26 Tr. 41-42; *see* Dkt. No. 21 ("A continued in person hearing is set for 07/02/2026 . . . to address the issue of whether sanctions should be imposed as to the Government."). The Court ordered Agent Erthal to be personally present at the sanctions hearing so that the Court could "have a better understanding of that if the Court is to try to determine if it should impose any other type of sanction in the case." 6/18/26 Tr. 42-43. The Court also quashed the outstanding arrest warrant for Edwards. *Id.* at 43; Dkt. No. 21. In its subsequent minute order, the Court directed a member of the Front Office to attend the hearing on July 2, 2026. Dkt. No. 21.

On June 26, 2026, this Court issued the following expanded minute order regarding the sanctions hearing scheduled for July 2, 2026:

> Regarding the upcoming July 2, 2026 hearing: The hearing will be an evidentiary hearing. In addition to FBI Special Agent Scott Erthal, any ATF Agents or FBI Special Agents who provided information to Special Agent Erthal, as described in paragraph 4 of the affidavit to the criminal complaint [Dkt. 1] are directed to appear in person at the hearing. The ATF representative referenced in paragraph 6 of the Government's motion to dismiss [Dkt. 14] is directed to appear in person at the hearing. The Court further directs that the AUSAs who appeared during the 6/18/2026 hearing also be present. The Court requests that the U.S. Attorneys' office have all videos referenced in the complaint and subsequently received by the U.S. Attorneys' office available during the hearing, if necessary to view in real time. Briefing is invited by any parties in advance of the hearing, bearing in mind that the Court may request additional briefing upon conclusion of the hearing.

Dkt. No. 28.

7

III.   **THIS COURT LACKS AUTHORITY TO CONDUCT THE WIDE-RANGING EVIDENTIARY INQUIRY CONTEMPLATED BY THE COURT'S ORDERS.**

   A.   This Court Lacks Jurisdiction to Conduct a *Franks* Hearing.

The government respectfully submits that this Court is without jurisdiction to conduct a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), which in sum and substance is the hearing the Court seeks to conduct on July 2, 2026.

As a threshold matter, a *Franks* hearing almost exclusively arises in the context of a defendant's motion to suppress evidence obtained pursuant to a search warrant. *See, e.g., United States v. Mullins*, 803 F.3d 858, 861 (7th Cir. 2015) ("A defendant is entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of information included in a search warrant application—if he can make a substantially preliminary showing that . . . ."); *see also United States v. Woodfork*, 999 F.3d 511, 516 (7th Cir. 2021); *United States v. Currie*, 739 F.3d 960, 963 (7th Cir. 2014); *United States v. Spears*, 673 F.3d 598, 604 (7th Cir. 2012); *United States v. Amerson*, 185 F.3d 676, 688 (7th Cir. 1999). There are rare exceptions where a *Franks* hearing has been held in the context of a defense challenge to an affidavit submitted in support of a criminal complaint, but those cases generally involve a defense effort to suppress evidence obtained from execution of the arrest warrant issued in conjunction with the criminal complaint. *Olson v. Tyler*, 771 F.2d 277, 281 n.6 (7th Cir. 1985) (noting that "the remedy differs" for *Franks* violations in arrest warrants as opposed to search warrants); *United States v. Vorley*, No. 18 CR 00035, 2020 WL 5512134, at *9 n.3 (N.D. Ill. Sept. 12, 2020) ("When it is discovered that a[n arrest] warrant was obtained by means of false information in an affidavit, the remedy is not

8

dismissal of a later-obtained indictment but invalidation of the warrant and possibly the suppression of evidence obtained based on that warrant."); *United States v. Cloud*, No. W-09-CR-66, 2009 WL 10703353, at *2 (W.D. Tex. May 27, 2009); *see United States v. Brown*, No. 119CVR00256NONESKO6, 2021 WL 3207265, at *4 (E.D. Cal. July 29, 2021).

A *Franks* hearing cannot be conducted under the present circumstances in this case because the only remedies contemplated by *Franks*—the suppression of evidence and/or the return of property—do not exist in this case. *See In re Search Warrant*, 40 F. Supp. 3d 143, 146 (D.D.C. 2014); *Brown*, 2021 WL 3207265, at *4 n.4 (questioning existence of "authority for the proposition that any remedy other than the suppression of evidence seized pursuant to a warrant is available under the principles announced in *Franks*"). Moreover, because the complaint has been dismissed, any potential *Franks* issue is moot, and this Court lacks jurisdiction to conduct a *Franks* hearing. *See passim*.

B.      This Court Lacks Authority to Make a Contempt Finding under the Federal Magistrate Act.

The jurisdiction and authority of this Court is defined—and constrained—by the Federal Magistrates Act, as set forth at 28 U.S.C. § 636. Section 636(e) establishes a magistrate judge's authority to conduct contempt proceedings. As relevant here, for alleged criminal contempt that occurs outside the presence of the magistrate judge or alleged civil contempt:

> the magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such

9

person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

28 U.S.C. § 636(e)(6).[4] Based on this statutory authority, the contempt power is vested "exclusively in the hands of Article III judicial officers." *Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037, 1044 (7th Cir. 1984) ("[U]nder no aspect of the Magistrate Act, can a magistrate punish for contempt." (citing 28 U.S.C. § 636(e)). A magistrate judge may certify facts to the district court, which then hears evidence and makes a contempt finding. 28 U.S.C. § 636(e)(6). *See also Wallace v. Kmart Corp.*, 687 F.3d 86, 90 (3d Cir. 2012) ("[T]the magistrate judge's certification of facts seems designed to serve the function of a charging instrument or pleading for a trial to be held before the district judge") (quoting *Taberer v. Armstrong World Industries Inc.*, 954 F.2d 888, 903 (3d Cir. 1992)). The district court must then conduct its own *de novo* fact finding and review. *See Taberer*, 954 F.2d at 902-04 (magistrate court "violated the statute's commands" when court ordered alleged contemnor "to appear before him to 'show cause,' conducted a hearing at which the government prosecuted

---

[4] Criminal contempt is designed to punish past conduct. *See Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 785 (7th Cir. 1981). Civil contempt is remedial, "its purpose being either enforcement of a prior court order or compensation for losses or damages sustained as a result of noncompliance with the provisions of the order at issue." *Id.; See also United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001) ("Sanctions for civil contempt are designed either to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy."); *FTC v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009). Because this case does not implicate any alleged failure to comply with a court order, the only form of contempt implicated is criminal contempt, although the general processes outlined in § 636(e) are the same for both forms of contempt.

10

[the alleged contemnor] and both parties presented evidence," and then made a criminal contempt finding, before referring the matter to the district court).[5]

Based on these decisions, this Court lacks authority to make any contempt findings. The Court's remedy for any other form of contempt is to certify the matter to the District Court for fact-finding and adjudication. For this reason, this Court lacks the authority to hold a contempt hearing.

C.     This Court Lacks Authority to Award Other Forms of Sanctions, But May Issue a Report and Recommendation to the District Court.

This Court also lacks authority to award other forms of sanctions, including under its inherent authority. *See, e.g., Alpern v. Lieb*, 38 F.3d 933, 936 (7th Cir. 1994) (holding, in the context of a referral of a motion for sanctions under Federal Rule of Civil Procedure 11, that a magistrate judge's authority was limited to making a recommendation); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 883 (7th Cir. 1999) (citing *Alpern* for the proposition that "a magistrate judge is without the authority to award sanctions"); *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 869 (7th Cir. 1996) (holding that pre- and post-trial motions for sanctions are dispositive matters

---

[5] Magistrate judges can issue criminal contempt sanctions for misdemeanors and for "misbehavior . . . in the magistrate judge's presence [that] . . . obstruct[s] the administration of justice." 28 U.S.C. § 636(e)(2), 636(e)(3), 636(e)(5). Neither provision applies here. *See also* Fed. R. Crim. P. 42(b). For example, in *In re: Search Warrant*, No. 00-MJ-138 (JMF) (D.D.C.), a magistrate judge considered whether he had the power to hold in contempt an FBI Special Agent for committing perjury when he swore out a search warrant. Dkt. No. 51 at 1. Noting the "limitations on the [summary] contempt power of a magistrate judge," the judge stated that "when the agent swore to the truth of his affidavit, I was not presiding over a judicial proceeding, the progress of which was obstructed by any act by the agent." *Id.* at 2. Although "perjury might be said to obstruct the administration of justice, the contumacious act must occur in the judge's presence when the judge is presiding," which was not the case. *Id.* A "contrary conclusion," the judge held, "cannot possibly be squared with the limited authority granted" by the Federal Magistrates Act. *Id.*

that may be referred to magistrate judge only for report and recommendation); *Bennett v. General Caster Service of N. Gordon Co.*, 976 F.2d 995, 998 (6th Cir. 1992) (holding, with respect to a Rule 11 motion, that a magistrate judge could not finally resolve the motion on its own and should "issue a report and recommendation for *de novo* review by the district court"); *Reddick v. White*, 456 F. App'x 191, 193-94 (4th Cir. 2011) (discussing a district court's inherent authority to sanction bad-faith conduct observing that "[a] motion for sanctions under the district court's 'inherent' power is not a pretrial matter under § 636[(b)(1)(A)]," and concluding that "the magistrate was permitted only to enter a Report and Recommendation [regarding sanctions] subject to the district court's *de novo* review").[6]

In light of the Seventh Circuit's case law, the government respectfully submits that this Court lacks authority to impose sanctions, and at most may make a report and recommendation to the district court in the event it believes sanctions are warranted. But, sanctions are such an extraordinary remedy particularly in these circumstances, that the government would respectfully submit that such a report and recommendation is not appropriate either.

**IV. MULTIPLE PROCEDURAL ISSUES MUST BE RESOLVED IN ADVANCE OF ANY HEARING.**

As discussed above, the government respectfully submits that this Court is not authorized to conduct a hearing in this matter. In the event there is such a hearing,

---

[6] Sanctions under Federal Rule of Civil Procedure 11 are civil in nature and thus do not apply in criminal proceedings. *See United States v. Hameen*, No. 23-12234, 2024 WL 449626, at *1-2 (11th Cir. Feb. 6, 2024) (summarily affirming denial of Rule 11 sanctions in criminal case, noting defendant's argument was "frivolous"); *see also United States v. Johnston*, No. 17 CR 517, 2018 WL 8786167, at *2 (N.D. Ill. Aug. 7, 2018).

the Court's minute order from June 26, 2026 (Dkt. No. 28) raises significant issues about the scope of the hearing. The government requests that the Court suspend any hearing until a clear set of procedures can be established concerning how the evidentiary hearing will be conducted.  Even then, because the government believes firmly that the Court lacks the authority to conduct the hearing it contemplates in the first place, the government asks this Court to stay any order it might enter to the contrary, so the government can appeal to the district court for immediate relief.

As a starting point to understand these issues, the government believes it necessary to provide more detail about the scope of the FBI investigation, the role of Agent Erthal in relation to that investigation, the roles of other individuals engaged in the investigation, and the government's acquisition of evidence before the filing of the criminal complaint.

A.    Background

1.    The Attempted Robbery of ATF Undercover Officers and a Confidential Informant During a Controlled Firearms Purchase

The charges in the criminal complaint arose from an alleged attempted robbery of money from two ATF undercover agents (UC-1 and UC-2) and a confidential informant (CI-2), who had arranged for the purchase of eight firearms from unknown gun traffickers in exchange for approximately $8,700 cash. The deal was arranged by CI-2 and Tevin Curlee, who had access to gun traffickers.[7]

---

[7] In the Affidavit, Curlee was anonymized as "Individual A." Curlee was subsequently charged in a separate criminal complaint with unlawfully possessing and transferring a machinegun, in violation of 18 U.S.C. § 922(o). *See United States v. Curlee*, No. 26 CR 285 (filed June 10, 2026). That charge related to a firearms purchase made by ATF agents from Curlee on or about June 3, 2026, during an earlier part of the same investigation.

The deal was scheduled for June 9, 2026. Initially, ATF did not know where the deal was going to take place. Rather, UC-1, UC-2, and CI-2 drove an undercover vehicle ("UCV") to Crestwood, Illinois, where they were joined by Curlee, who directed the driver (UC-1) to drive to a residence on Loretto Lane in Country Club Hills. This meant that there were four individuals in the UCV: UC-1 in the driver's seat, UC-2 in the front passenger's seat, CI-2 in the rear passenger's seat, and Curlee in the rear driver's side seat. Following Curlee's directions, UC-1 drove to Country Club Hills and, at approximately 4:48 pm, pulled into the driveway of a single-family residence, which was the deal location given by Curlee.

At the time the UCV pulled into the driveway of the Country Club Hills residence, there were eight recording devices operating, which are identified below:

| Device Description | Audio or Video |
|---|---|
| UC-1's Person | Both |
| UC-2's Person | Both |
| CI-2's Person | Both |
| Cellular Phone in UCV | Both (Video Very Poor) |
| Four cameras in UCV | Both |

These recording devices were started before Curlee was picked up in Crestwood.

14

At the time they reached the Country Club Hills residence, additional ATF personnel were staged nearby to conduct surveillance and to provide security for the undercover agents as needed.[8] As is standard procedure for agents serving in a non-active support function, none of the supporting ATF personnel were wearing body-worn cameras and their vehicles were not equipped with dashboard cameras or other activated recording equipment.

After UC-1 pulled into the driveway of the Country Club Hills residence, Curlee appeared to continue communicating via text messages with the individual(s) who were expected to bring the firearms to the deal. At one point, Curlee exited the UCV and was believed to engage in phone conversations with one or more people who were coming to deliver the firearms.

At approximately 5:24 pm, a white Dodge Dart drove down Loretto Lane and stopped in the street near the driveway where the UCV was parked. Undercover agents observed that the Dodge Dart contained approximately six individuals, many of whom appeared to be wearing balaclava style face masks. Fagan approached the UCV without a face mask and stood close to CI-2 and Curlee, both of whom were outside of the UCV. UC-2 had also exited the UCV and was standing on the passenger side of the UCV. An image of Fagan (captured on CI-2's recording device) as he arrived near the back of the UCV's vehicle appears below:

---

[8] As used herein, the term "ATF personnel" includes employees of other agencies who were assigned to work at ATF or otherwise subject to ATF's direction, *e.g.*, a local police officer who worked with ATF as a "Task Force Officer" (as opposed to an ATF "Special Agent," who is an ATF employee).



As Fagan approached the UCV, he was followed by a masked individual holding a backpack, with what appeared to be a portion of a firearm sticking out of the backpack. A brief exchange of words then took place about the deal. A still image captured from UC-2's video recorder depicts (left to right) Curlee, the individual holding the backpack, and Fagan (reaching into his jacket), with the red circle depicting the object protruding out of the backpack:



At that point, Fagan and the individual holding the backpack asked to see the purchase money for the guns. Urged by Curlee to show the money, UC-2 flashed the roll of purchase money by lifting it out of his front pocket.

At this point, Fagan appeared to direct the individual with the backpack to return to the Dodge Dart. As he did so, the driver of the Dodge Dart, subsequently identified as Toney, opened the door of the vehicle. At approximately the same time, another masked individual with dark clothing exited the passenger side of the Dodge Dart and pointed a firearm at UC-2, as depicted below, which shows (from left to right): (1) Toney sitting in the driver's seat of the Dodge Dart; (2) the masked individual who came from the passenger side of the Dodge Dart standing in the street near the back of the Dodge Dart; and (3) the individual with the backpack:[9]



Fagan then pulled a firearm out of his coat, and the individual with the backpack likewise drew the gun out of the backpack. Both men then pointed their guns in the direction of UC-1, UC-2, CI-2 and Curlee, as depicted below, respectively:

---

[9] The date and time stamp on the recording devices placed on UC-1, UC-2 and CI-2 were incorrect due to a failure to check them prior their use on June 9, 2026.

17



(Amir Fagan)



(Individual With Backpack)

Around the same time, another masked individual exited the passenger side of

the Dodge Dart and possibly pointed a firearm toward the individuals near the UCV.

That individual is identified by the red oval appearing in the photograph below,

18

standing near the first individual who exited the passenger's side of the Dodge Dart (green oval), with the individual with the backpack appearing in the upper right of the frame (blue circle):



Therefore, at this point, multiple assailants were pointing firearms at UC-1, UC-2, CI-2 and Curlee. UC-2 urged the assailants to put down their weapons, but they did not do so. Around this same time, a distress signal was given and other assisting agents sped toward the scene to protect UC-1, UC-2, and CI-2. Several of the vehicles activated their police lights and sirens to identify themselves as law enforcement.

The assailants then attempted to flee. Fagan attempted to flee on foot, but an ATF agent shot at him, grazing his head and striking his arm. Fagan fell to the ground from his injuries and was taken into custody.

Meanwhile, Toney, the female owner of the Dodge Dart (who had remained in the vehicle), and other assailants attempted to flee in the Dodge Dart.[10] Toney began driving south on Loretto Lane, but his route was soon obstructed by a law enforcement vehicle moving north on Loretto Lane. Toney's vehicle struck the front

---

[10] Based upon a UCV recording, at least one of the assailants fled on foot without re-entering the Dodge Dart.

of that vehicle. Toney then drove away from the first law enforcement vehicle and attempted to drive across the grass of the property near the residence where the UCV was parked in an effort to escape, but his vehicle was struck by a second government vehicle and became disabled. Thereafter, the assailants in the Dodge Dart exited that vehicle and ran into the adjoining neighborhood, chased by a multitude of law enforcement officers who were fanning out in various directions. The female owner of the vehicle remained seated in the Dodge Dart and did not attempt to flee; she was detained, questioned and later released.

At this point, only one of the assailants who pointed guns at the undercover agents and confidential informant (Fagan) was in custody. The remaining four suspects—the individual with the backpack, the two individuals who stood near the back of the Dodge Dart, and the driver of the Dodge Dart (Toney)—were escaping on foot through a residential neighborhood and were believed to be heavily armed. Aside from the danger that the fleeing assailants might fire their weapons at law enforcement (or ordinary citizens), there existed the very real possibility that the assailants might attempt to evade capture by entering a person's home to hide (and potentially taking occupants hostage in the process) or by carjacking a driver. Notably, the site of the attempted robbery is mere blocks from the intersection of Cicero Avenue and Flossmoor Road, which, at that time, would have been serving as major arterial routes for the evening rush hour. Google maps images of the neighborhood are set forth below, with the red location marker identifying the address where the UCV was parked:

20





21

In light of this danger, ATF called for additional law enforcement to help search for the escaped assailants. Law enforcement soon began to arrive from Country Club Hills and neighboring suburbs and, joined by the Illinois State Police, assisted in searching the neighborhood and nearby Forest Preserve for the suspects.

Meanwhile, an ATF TFO encountered Edwards near the end of a cul-de-sac on Martin Court, which was approximately two to three blocks away from the site of the attempted robbery, as indicated by the red star below:



The ATF TFO attempted to arrest Edwards, but Edwards resisted, including previously striking the ATF TFO, which ultimately led to the ATF TFO discharging his service weapon and striking Edwards. A small portion of the TFO's encounter with Edwards is captured on the short video recording that was submitted as Exhibit 2 to the motion to dismiss.

A while later, law enforcement found Toney hiding in a nearby residential garage. A hoodie matching the one worn by the driver of the Dodge Dart was located nearby.

### 2. FBI's Involvement

After the attempted robbery and shootings, the ATF notified the FBI about the incident. Agent Erthal is assigned to the FBI's South Resident Agency ("South RA"), which is located in Orland Park, Illinois. Agent Erthal was at home when he received a blast message to South RA FBI agents urging them to assist ATF in its apprehension of the escaped assailants. Agent Erthal immediately donned his tactical field gear and drove to the site of the attempted robbery.

Agent Erthal arrived approximately two hours after the attempted robbery. He was initially tasked with conducting a door-to-door canvas of local residents to determine if they had any exterior cameras that may have recorded the attempted robbery or escape. Agent Erthal was unable to procure any additional video. Later in the evening, Agent Erthal continued to assist in the effort to locate evidence that could be useful to identifying or apprehending the assailants. During the early

23

morning hours of June 10, 2026, Agent Erthal interviewed Fagan at the hospital, then returned to the South RA, where he worked until approximately 4:00 a.m.

After a couple hours of sleep, Agent Erthal returned to the South RA. Although another FBI agent was originally assigned to serve as the affiant on the criminal complaint, that duty was handed off to Agent Erthal after he returned to the South RA on June 10, 2026. Thereafter Agent Erthal worked on developing the factual portions of the Affidavit, primarily working with three ATF agents, one of whom was UC-1, while the other two were occupants of the second vehicle that struck the Dodge Dart. When the complaint was signed by Agent Erthal later on June 10, 2026, ATF had not authored any reports concerning the prior evening's events. Rather, the evidence they had in their immediate possession consisted of the ATF audio and video recordings (described above) and the physical evidence that had been located up to that time. Acting in good faith and with the desire accurately describe the violent events that had transpired, Agent Erthal reviewed those video recordings, consulted with the ATF agents as factual questions arose, and relied upon his own memory of what he had perceived the previous evening and heard from other investigators.

B.     Multiple Procedural Aspects of the Evidentiary Hearing Need to Be Clarified and Resolved.

In addition to challenging the authority of the Court to conduct the evidentiary hearing in the first place, the government seeks clarification concerning the purpose, scope, and mechanics of the evidentiary hearing, which the government maintains should not happen at all as a matter of law.

24

As a starting point, there is no evidence before the Court that Agent Erthal engaged in wrongdoing. The government concedes that the Affidavit, drafted less than 24 hours after the attempted robbery in the immediate aftermath of ongoing law enforcement efforts to identify the escaped robbers and continue locating evidence, described some respects of the shooting of Edwards and the alleged assault by Toney in a manner that was less than precise. Further, based on later investigation, the government has concluded that the criminal complaint misidentified Edwards as the robber with the backpack, although that was not a reason the government originally sought dismissal of the complaint.

However, Agent Erthal was not present at the time of the robbery and made those representations based upon the good-faith information gathering he conducted, which included speaking to ATF. That is common in criminal investigations, including ones involving a large crime scene that involved multiple subjects and numerous law enforcement officers who were working intensely and sharing information in real time as it was obtained. A mistake or error is not a lie. And when the United States Attorney's Office came to inquire into the precision and full context of the description of Edwards' arrest based on the video it subsequently received on June 16, 2026 (almost a week after the affidavit was sworn out), and, further, the description of Toney's alleged assault on a law enforcement officer, it promptly sought dismissal of the criminal complaint.[11] That means it was the United States Attorney's

---

[11] Indeed, the government moved so quickly to dismiss the complaint that the government itself did not appreciate the full context of the video and how it fit into the events that transpired that day. Specifically, the video in question captures approximately the last 25 seconds of the encounter between the TFO and Edwards prior to the shooting. Of course, the

Office—not anyone else, including this Court—that promptly brought these issues to the Court's attention. Indeed, these are the actions of government actors acting in good faith, and for whom the presumption of regularity should strongly attach, as the law states should be the case. There is absolutely nothing in the government's immediate notification to the Court of the discovered video evidence that should cause the court to disregard the presumption of regularity to which the government is entitled; to the contrary the government's actions should give confidence to the Court that the presumption is entitled to adherence and respect. Indeed, nor should any other outside influences—which are irrelevant to these proceedings—bear on the Court's consideration or weighing of the presumption of regularity.

Again, Agent Erthal had neither received nor reviewed a copy of the video before he swore out the criminal complaint and, likewise, he received the email about Toney's flight four days after swearing out the criminal complaint. In compiling the facts set forth in the Affidavit, Agent Erthal relied, in part, on the input of multiple law enforcement officers, including ATF agents who were at the scene of the attempted robbery. Given the number of people involved in the investigation, it was reasonable for Agent Erthal to rely upon representatives of the ATF and others in the immediate aftermath of an intense, fast-moving investigation that was traumatic for

---

interaction between the two lasted for minutes and those earlier interactions leading up to the video, including Edwards striking the TFO, were not captured by that video, or other videos. As such, although the motion to dismiss described the video as "appear[ing] inconsistent with the description in the Affidavit," the video, of course, does not present the entirety of the interaction between the TFO and Edwards, which remained unknown at the time, but has since become known to the government based on the extensive work the government has done since then.

those involved in the incident.  And, again, to the extent honest, good-faith lack of precision occurred under these volatile circumstances, such issues are not deserving of the extraordinary remedy of punishment. *See also In re Michael,* 326 U.S. 224, 228 (1945) (holding that even "perjury alone" does not constitute criminal contempt, but there must also be clear evidence of obstruction).

Here, there is no evidence to support the claim that Agent Erthal—or anyone else—intentionally misled the Court, attempted to obstruct justice, or acted in reckless disregard for the truth, even if his Affidavit asserted facts, obtained from other law enforcement during the swiftly changing circumstances of June 10, 2026, that turned out to be less than precise.

1. <u>The testimony should be limited to Agent Erthal.</u>

Given that backdrop, the government infers that the purpose of the hearing is to explore the flow of information from the ATF to the FBI, to determine the source of any error or lack of precision in the Affidavit. But the only conceivably relevant inquiry is whether Agent Erthal engaged in wrongdoing. Indeed, in the general *Franks* context, "the fact that a third party lied to the affiant, who in turn included the lies in a warrant affidavit, does not constitute a *Franks* violation," which "occurs only if the affiant knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth." *United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994) (cleaned up). Therefore, to the extent the Court is inclined to hear evidence and make a recommendation to the district court, the government respectfully requests that the hearing testimony be limited to Agent Erthal.  But, even then,

27

because the government's position is that the Court lacks authority to engage in this inquiry in the first place, the government respectfully asks that the hearing be terminated altogether.

Also instructive here is *In re: United States*, 398 F.3d 615 (7th Cir. 2005). In that case, District Judge Holderman ordered an investigation into the filing of an *ex parte* application by the U.S. Attorney's Office, which Judge Holderman believed may have misled the district court judge previously assigned to the case. *Id.* at 617-19. Judge Holderman "threatened to hold the Assistant in criminal contempt of court, and he demanded to know who within the United States Attorney's Office participated in the decision to file such a request and why they had approved it." *Id.* at 617. The Seventh Circuit granted the government's petition for a writ of mandamus, holding that "the inquiry is inappropriate and must cease." *Id.* at 616-17. "[T]he United States Attorney is not answerable to a judge for the deliberations among his staff," the Court held, nor for "[h]ow the United States reaches its litigating positions, [or] who said what to whom within the prosecutor's office." *Id.* at 618. Moreover, "[o]ur legal system does not contemplate an inquisitorial role for federal judges." *Id.* at 619. Thus, even "[i]n the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch." *Id.* at 618.

28

This decision, though involving a criminal contempt inquiry into the United States Attorney's Office, nonetheless stands for the principle that a court's criminal contempt inquiry should not extend beyond the questioning of the person before the Court. In so holding, the Seventh Circuit recognized the need to respect the separation of powers between the Judicial and Executive branches: "Judges are often tempted to seek a larger role in the conduct of litigants that appear frequently before them. . . . But temptation must be resisted in order to maintain separation between executive and judicial roles, and between the formulation and evaluation of positions in litigation." *In re: United States*, 398 F.3d at 618. Here, the relevant inquiry, at most, would concern Agent Erthal's own personal knowledge. And, the grave concerns that the Seventh Circuit expressed in that mandamus opinion that led the Court to firmly and unequivocally state that the district court's "inquest" must "halt" and that the "inquiry is inappropriate and must cease," *id.* at 617, apply even more here, because unlike in the case of the Judge Holderman matter, where the Court there was an Article III constitutional court, this Court is an Article I statutory court created by an act of Congress and thus limited in its powers as already described above.

### 2. The Role of Defense Counsel in the Hearing

The government also respectfully requests that defense counsel be precluded from participating in any evidentiary hearing or inquiry into sanctions. *See Kienle v. Jewel Tea Co.*, 222 F.2d 98, 100 (7th Cir. 1955) ("[A] private person . . . is not a proper party to a criminal contempt proceeding. . . . [F]urther proceedings are conducted

29

through the office of the court or the United States as the representative of the public in vindication of the court's dignity and authority."); *Barry v. United States*, 865 F.2d 1317, 1327 (D.C. Cir. 1989) (Sentelle, J., dissenting) (once contempt is reported, the "complaining 'target' is no more a party to the proceeding than a victim witness in any other criminal case"); *Brant v. Gooding*, 636 F.3d 124, 135 (4th Cir. 2011) (party to underlying proceeding has "no legitimate interest in such a" criminal contempt proceedings); s*ee also In re Trump*, 172 F.4th 44, 54 (D.C. Cir. 2026) (vacated for en banc hearing scheduled for September 2026) ("Interested counsel are barred from participating in the prosecution of criminal contempt . . . This prohibition reflects the risk that interested parties may use the prosecutorial power for ends other than the 'attainment of justice,' such as 'gather[ing] information of use' in other lawsuits") (quoting *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 790 (1987)).

Based on this clear authority, this Court should refrain from deputizing the defendants' attorneys as agents of the Court for the purpose of adducing evidence regarding whether sanctions are appropriate. Moreover, the concern expressed in *In re Trump* and *Young* about contempt proceedings serving as a means to further other lawsuits is more than theoretical given that Edwards (through other counsel) has apparently filed a civil lawsuit related to his shooting.[12] Finally, even if defense counsel are allowed to participate—a decision that the government would appeal to the district court—only counsel for defendants Edwards and Toney should be allowed

---

[12] This is based upon a media report. https://abc7chicago.com/post/federal-charges-dismissed-3-suspects-involved-atf-shooting-gun-trafficking-operation-country-club-hills-court-docs/19326758/

to participate because the motion to dismiss was premised on the receipt of additional information that questioned only the accuracy of the Affidavit with respect to those defendants. But, again, it is the government's firm position that outside participation by counsel should be disallowed.

        3.      <u>Preservation of Undercover Agent and Confidential Informant Identities</u>

Another issue of significant importance to the government is ensuring the protection of the identities of UC-1, UC-2, and CI-2. In *Roviaro v. United States*, 353 U.S. 53, 59-61 (1957), the Supreme Court held that the government has a limited privilege to withhold the identity of confidential informants. Although the government's privilege is not unlimited and must yield to the need to a defendant's right to a fair trial (*id.*), those circumstances are not yet at hand. Moreover, at least one of the robbers remains at large (the individual holding the backpack). Likewise, until their testimony becomes necessary to ensure a defendant's Due Process rights, the identity of the undercover agents involved in the incident should not be publicly disclosed. There are multiple ways that this could happen.

First, on various video recordings that this Court has asked the government to provide to the Court, the faces of UC-1, UC-2 and CI-2 are visible. The government therefore asks that the Court's review of the recordings not be done in open court and that the video recording exhibits be sealed as part of the record; alternatively, if the Court plans on making the recordings available to the public (either in Court or on the public docket), then the government requests time to consult with technical experts to determine whether there is way to redact or blur the recordings so that the

identities of those individuals (both law enforcement and confidential informant) are not exposed, including their faces and voices, to avoid potentially grave security issues to them or other third parties, such as any family or loved ones.

Second, the breadth of the Court's inquiry already contemplates the testimony of UC-1, so that undercover agent's identity will be exposed during the hearing.

Third, the questioning of any witness may lead, even if indirectly, to questions that expose the identity of the undercover agents and confidential informant.

Because the Court lacks the authority to conduct the desired hearing, it should not be necessary for the Court to design an agreed set of protocols for the hearing that will ensure protection of the identity of UC-1, UC-2 and CI-2. But, an agreed set of protocols would be needed before any hearing could occur, and as such, the government respectfully maintains, there is the risk of serious harm to law enforcement agents and confidential informants under these circumstances.

### 4. The number of potential witnesses is substantial.

The Court's order of June 26, 2026, directed that "any ATF Agents or FBI Special Agents who provided information to Special Agent Erthal, as described in paragraph 4 of the affidavit to the criminal complaint . . . are directed to appear in person at the hearing [scheduled for July 2, 2026]." Dkt. No. 28. The government believes that the Court likely issued this requirement based on the (not unwarranted) assumption that Agent Erthal spoke with a relatively small number of FBI and/or ATF agents in developing the Affidavit. That is, however, not the case. As described above, Agent Erthal was actually at the crime scene on the evening of June 9, 2026,

32

and, in an effort to conduct a thorough and complete review and investigation, spoke with numerous law enforcement officers during his time on scene. Therefore, the number of agents that could fall within the scope of the Court's directive is potentially very high (approximately 13 federal agency personnel based on Agent Erthal's current memory), and that does not include input he received from other State or local law enforcement officers who assisted at the scene.

Accordingly, the government requests that the Court, if it intends to question persons other than Agent Erthal, modify its order so that a reasonable and manageable number of witnesses be examined in each hearing session. But, again, because the Court lacks authority for a hearing in the first place, the government maintains the Court should strike the hearing.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: */s/ Timothy J. Chapman*
TIMOTHY J. CHAPMAN
LUKE FIEDLER
Assistant United States Attorneys

33